## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **NEKITA WHITE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:16-CV-190-VEH** |
| | ) |
| **ALABAMA INSTITUTE FOR THE** | ) |
| **DEAF AND BLIND et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

### I.    INTRODUCTION AND PROCEDURAL HISTORY

This employment discrimination action was filed on February 1, 2016, by

Plaintiff Nekita White against Defendants Alabama Institute for Deaf and Blind

("AIDB"), John Mascia, and Christy Atkinson. (Doc. 1). Count I alleges race-based

discrimination under 42 U.S.C. § 1983. (*Id.* at 7-9). Count II alleges retaliation, under

§1983 and Title VII of the Civil Rights Act of 1964, for filing EEOC charges. (*Id.* at

10-11). Count III alleges harassment and a hostile work environment. (*Id.* at 11-12).

Before the Court are two motions for summary judgment.  The first is from

Defendants Alabama Institute for Deaf and Blind and John Mascia (the

"AIDB/Mascia Motion"). (Doc. 34). The second is from Defendant Christy Atkinson

(the "Atkinson Motion"). (Doc. 37). The motions are ripe for review.

Additionally, AIDB and Mascia filed a Motion To Strike White's response to their motion for summary judgment. (Doc. 45). Atkinson filed a Motion To Strike White's response to her motion for summary judgment. (Doc. 47). Finally, Mascia "asks the Court to impose sanctions against [White] and/or her attorney." (Doc. 35 at 11).

For the reasons herein stated, these motions are due to be **GRANTED** in part and **DENIED** in part.

## II.   STANDARDS

### A.   Motions To Strike

It has long been the law in this circuit that, when deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence.  In 2010, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c)(2).

### B. Motions For Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, Depo.s, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor

of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16.

First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116.  In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II. FACTUAL BACKGROUND[1]

### A.     The Motions To Strike Are Due To Be Denied.

As an initial matter, the Court takes up the Defendants' Motions To Strike since they will affect the factual background and the ultimate determination on summary judgment. *See English v. CSA Equipment Co., LLC*, 2006 WL 2456030, *2 (S.D. Ala. Aug. 22, 2006) (Steele, J.) ("Because any summary judgment evaluation necessarily hinges on the type and nature of facts in the record and on the arguments that may be considered, and because the Motion to Strike calls into question which facts and arguments are properly before the Court, resolution of that Motion is the appropriate analytical starting point.").

AIDB/Mascia move to strike all references to the time period preceding September 27, 2013, because the Complaint specifies that it refers to the events after

---

[1]  The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed it has been included without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

that date. (Doc. 45 at 1-2).[2] At the very end of the motion, without much explanation, AIDB/Mascia claim that these references should be stricken because they are "barred by the statute of limitations; outside the parameters of the complaint; [have] no continuity given the personnel changes of AIDB; and [have] no connection with the employment position that occurred after September 27, 2013." (*Id.* at 2). The Court notes that the objected-to references occurred immediately prior to the date of the complaint. This temporal proximity, combined with AIDB/Mascia's failure to cite a single legal authority showing why the objected to references should be stricken, convinces the Court it should not strike those references. Accordingly, this motion is **DENIED**.

Additionally, Atkinson takes issue with the manner in which White responded to her Motion For Summary Judgment. (Doc. 47 at 2). Atkinson states that White's response "does not state additional disputed facts in a separately designated section as mandated in the Court's summary judgment requirements." (*Id.*). Atkinson asks the Court "to strike: (1) any statements of alleged facts interspersed in [White's] response to [Atkinson's] fact statements; and (2) all assertions of facts by [White] that are not supported by specific references to the evidence." (*Id.*).

The Court's Uniform Initial Order speaks to Atkinson's Motion To Strike. (*See*

---

[2]   Atkinson adopts all the arguments in AIDB/Mascia's Motion To Strike. (Doc. 47 at 1).

Doc. 3). The Court declines to strike White's statements in her response to Atkinson. The Court will instead treat them as the evidentiary record being used to dispute Atkinson's facts. While White's response is not conventional,[3] the Court notes that Atkinson was able to reply effectively. (Doc. 46). Further, "this court has managed to parse those responses." *See Rhodes v. Arc of Madison County, Inc.*, 920 F. Supp. 2d 1202, 1225 (N.D. Ala. 2013) (Smith, J.). However, the Court also notes that this case is at the summary judgment stage. That means that assertions of fact need to be buttressed by citations to the record, as the Court's previous discussion of the standard indicates. Getting past summary judgment is very different from getting past the pleading stage. Accordingly, the Court does not give weight to naked allegations of fact that do not have a citation to the evidentiary record. Obviously, this goes for all parties. In conclusion, Atkinson's Motion is **DENIED**.

## B.     Statement of Facts Relating to Atkinson

Christy Atkinson served as principal of the Helen Keller School from July 2011 until August 2015. Nekita White began working at AIDB in July 2004 as a Dorm Aide on third shift. White identified, in her deposition, seven jobs as AIDB that she applied for but was not hired due to alleged discrimination or retaliation:

---

[3] These long, narrative-like responses, that often neither expressly admitted or denied the allegedly undisputed fact, created extra, unnecessary, work for the Court.

1. Dorm/Teacher Aide, Helen Keller School–January 29, 2012
2. Dorm/Teacher Aide, Helen Keller School–February 2, 2012
3. Job Coach, Helen Keller School–June 13, 2014
4. Job Coach, Helen Keller School–June 22, 2015
5. Job Coach, Helen Keller School–August 5, 2015
6. AIDB Bus Guide–May 20, 2016
7. Job Coach, Helen Keller School–August 23, 2016

Atkinson was not employed at AIDB in 2016 and had nothing to do with the last two job openings above. The job and qualification requirements for Dorm Aides included monitoring students every thirty minutes, ironing, washing/folding clothes, mopping, making beds, waking students, assisting dressing, administering medication, and feeding breakfast. (White Ex. 1); (White Depo., 17:6-10).

Dorm/Teacher Aides differ from Dorm Aides and were responsible for assisting a teacher in instructing students in the classroom. Dorm/Teacher Aide positions required one year experience working with students in an educational environment.[4]

The AIDB Human Resources Department, not Atkinson, took applications for open jobs and selected the applicants to be interviewed. Atkinson was not provided application materials for White in January or February 2012. In January and February 2012, available Dorm/Teacher Aide positions were posted for AIDB in its entirety,

---

[4] White eventually accepted a job as a Dorm/Teacher Aide in July 2012. (White Depo., 30-31).

not just for positions supervised by Atkinson. Applications were submitted to the Human Resources Department and interviews were scheduled and conducted by the Human Resources Department.

Representatives from each AIDB campus attended the interviews for the available positions in January and February 2012. Atkinson attended to interview candidates for second and third shift jobs at the Helen Keller School. At that time, the Helen Keller School did not have a first shift Dorm/Teacher Aide position available. White was not one of the candidates who interviewed for the available jobs in January and February 2012, and Atkinson did not know that White had applied for any job at the Helen Keller School. (Atkinson Dec. at 3). However, White did apply for the Dorm/Teacher Aide job postings in January and February 2012. (White Depo. at 211-212). This was after she had submitted her physician's note to the Human Resources office regarding her diagnosis of severe circadian rhythm disorder and requested an accommodation that she change to day shift or day evening shift. (White Depo., 209); (White Ex. 3). White sent a letter to John C. Connell, Director of Residential Staff, regarding a letter from her physician about her diagnosis and requested an accommodation. (White Ex. 4). Connell submitted a letter to White indicating that he received her October 25, 2011, letter informing him of her medical disorder and request for accommodation and that, at that time, there was not a position available

to accommodate her. (White Ex. 5). In January 2012, White obtained a physician's note from Dr. Moersch saying that she is pregnant, and the pregnancy is a high risk threatening miscarriage. (White Ex. 8).

The selection for each available job at the Helen Keller School while Atkinson was Principal was made by a committee whose members rated each applicant independently. The average of the committee members' scores for each candidate determined the candidate who scored highest, who Atkinson would then recommend for the job. Atkinson's scores were weighted equally with those of the other committee members.[5] Atkinson did not attempt to influence the scores or decisions of other committee members or affect the recommendations in any way other than making her own individual evaluation of each candidate.[6]

Atkinson and Tenicia Barclay, a black female, interviewed the qualified candidates for a Job Coach position in June 2014. The committee recommended Katie Trotter, a white female,[7] for the Job Coach position in June 2014. White contends that Atkinson was on the selection committee to discuss her and negatively influence the

---

[5] White's response to Atkinson's Fact No. 12 is an example of the type of narrative answer that Atkinson moved to strike earlier. It consists of numerous sentences that are without citation to any evidence in the record.

[6] White denies this fact but does not cite to any evidence in doing so. (*See* Doc. 41 at 7). A mere denial by counsel is not enough.

[7] (Atkinson Decl., 3).

committee as it relates to her and Atkinson's animosity towards her because of the EEOC complaints White filed. Trotter met all the requirements for the Job Coach position.White believes that she did as well. (White Depo. at 118: 6-9). The responsibility of a Job Coach was to help train students for jobs with employers outside of AIDB.  Trotter had prior, similar experience preparing students for living and working outside AIDB. She also had completed college courses toward a degree in education.  Atkinson claims that she ranked  Trotter higher than  White because of prior relevant experience, education, and more favorable impressions during the interview. In response, White falls back on her general allegations of Atkinson's animosity. She then relies on a conversation she had with Trotter that indicated that she was interviewed over the phone and accepted after being called while in the shower. (Doc. 41 at 8).[8] However, this is not enough to create a triable issue because White does not to cite to any record evidence that disputes that Atkinson chose Trotter based on legitimate reasons.

White alleges that Nephateria Jones,[9] a black female, was hired for a Job Coach

---

[8] It is not clear to the Court after reading the deposition whether this was referring to one phone call or two.

[9] Atkinson spells Ms. Jones's first name as "Nepheteria." (Doc. 38 at 9). AIDB/Mascia spell Ms. Jones's first name as "Nephataria." (Doc. 35 at 7). They also spell her name as "Nefeteria." (*Id.* at 13). White spells Ms. Jones's first name as "Nephateria," so that is what the Court has used. (Doc. 40 at 8).

position that White also applied for. White described Jones, who had a master's degree, as "overqualified", but also claimed Jones lacked certifications for CPR and sign language and did not have a commercial driver's license. AIDB job candidates are allowed to obtain those required certifications within a specified time after being hired and are not required to possess them upon applying. Jones had a master's degree in business, had worked at a community college helping place students in jobs in the community, and had worked for a group home specializing in transitioning residents to the community. Jones was fired after approximately one year at AIDB.[10] Atkinson found Jones to be better qualified than White.[11]

White does not remember if she interviewed for a Job Coach position in August 2015. She does not know who was selected for the position, but she believes a black female named Shametra Miller was hired. Miller had previously been a teacher in the Anniston City School system and was overqualified, in White's opinion. White interviewed for the Job Coach position and did not receive anything acknowledging her application nor any correspondence indicating that she had not been selected for the position. (White Depo., 139:4-12). Miller was selected but left

---

[10] The Court notes that White claims she was qualified for this job position, but her cited deposition testimony does not state that she possessed a CDL and was proficient in sign language at this time. (*See* Doc. 41 at 8).

[11] White does not cite to any evidence to rebut this contention. (*See* Doc. 41 at 8).

after one year of employment as Job Coach. (White Depo., 137:9-12).[12]

White requested as an accommodation for a sleep disorder in October 2011 to move to first shift or a split day/evening shift. She reported to her doctor she was sleeping from four hours (9AM - 1PM) to six hours (8AM - 2PM) per day at that time. (Atkinson Ex. 11, Physician's Note and Work Status Report). At the time White requested a shift change based on her doctor's recommendation, there was no first-shift position available. (Atkinson Depo., 35:1-5, 37-6-19). White was offered a split day/evening shift job in December 2011, which she declined.[13] AIDB placed White in a first-shift position in June 2012, which was the first first-shift position to become available after White provided the recommendation from her doctor. (Atkinson Depo., 42: 14-21).[14]

White also cites to evidence to support her allegations of a hostile work environment. She was removed from the substitute list. (White Ex. 25, 26, 27). She was not allowed to have a baby shower before 3PM, and she introduced evidence that

---

[12]  White's citation does not support the fact that she met the position requirements or that she was qualified for the position. (*See* Doc. 41 at 10) (citing White Depo., 139: 4-12).

[13]  White submitted medical notes from Dr. Rahim Fazal and Dr. Barbara Moersch regarding her medical condition (severe circadian rhythm and high risk pregnancy threatening miscarriage) and, based on medical advice, was unable to accept the split shift position. (White Depo., 30: 9-19, 68: 14 to 69:4, 82:21 to 83:12); (White Ex. 3); (White Ex. 8); (White Ex. 35). However, White's Exhibit 3 actually indicates that Fazal indicated that a "day-evening split shift" would benefit White. (White Ex. 3).

[14]  White denies this but does not cite any evidence. (*See* Doc. 41 at 11).

others had been allowed to do so. (White Ex. 12, 13, 14). She was removed from the active bus driver list. (White Ex. 29, 30, 31). She was required to draft and submit an additional statement related to a medical error even though she complied with AIDB medical error protocol. (White Ex. 15-24).

### C. Statement of Facts Related to AIDB/Mascia[15]

#### a. White's Allegations of Discrimination

Students in the Awakenings Program, ages 3 to 21, are severely impaired. Night shift Dorm Aides check on the kids every 30 minutes while they are asleep; iron and wash their clothes; clean the dorm; and administer medication. From 2004 to 2011, White worked at AIDB as a 3rd shift (night shift) Dorm Aide. (Challender Aff. at 13-14). In October 2011, White's physician, Dr. Rahim Fazal, diagnosed her with severe circadian rhythm disorder and requested an accommodation that she change to day shift or day evening split shift. (White Depo., 209:3-8); (White Ex. 3). On October 24, 2011, White advised her supervisor that she had a sleep disorder–Circadian Rhythm sleep disorder. (Challender Aff. at 13-14). She forwarded a letter to John C. Connell, Director of Residential Staff, informing him of her physician's diagnosis of severe circadian rhythm disorder and request for accommodation. (White

---

[15] The Court decided it made the most sense to address these facts in a chronological fashion. According, Defendants' Section J is addressed earlier here than the Defendants wrote it in their brief.

15

Ex. 4). Connell drafted a letter to White acknowledging receipt of the October 25, 2011, letter and the severe circadian rhythm disorder and request for accommodation and that at that time, there was not a position available to accommodate her. (White Ex. 5). A meeting was scheduled for November 4, 2011, to discuss White's medical issue as well as accommodation, but the meeting did not occur. (White Ex. 6). The meeting was rescheduled for November 8, 2011, with Connell memorializing the meeting in a memorandum dated the same day. (White Ex. 7). On January 5, 2012, White was informed she was pregnant/ high risk pregnancy threatening miscarriage. (White Ex. 8). In January 2012, White was offered a split shift position, a position she declined because she had a high risk pregnancy and could not perform the duties. (Doc. 36-4 at 12); (White Depo., 30:8-31:4); (Atkinson Depo., 37:22-38:5). The position was offered to Michelle Lizik. White went on FMLA leave from January 31, 2012, to March 10, 2012. In July 2012, White was offered a 1st shift position as a Dorm Teacher Aide. She accepted the position. (White Depo., 30:8 to 31:4). The Dorm Teacher Aide position was offered to her without her applying for the position.

Dorm Teacher Aides serve the same students as Dorm Aides and have similar duties. Dorm Teacher Aides work different hours than Dorm Aides – 8 a.m. to 4:30 p.m. Dorm Teacher Aides assist the teacher: toileting, eating, attending gym, therapy, field trips, and changing diapers. They help clean and maintain their work

environment, as do Dorm Aides. The lead teacher for the Awakenings Program was Jennifer Oldenburg. White was assigned to her. White believes she was discriminated against when she applied for, but was not selected as, a Dorm Teacher Aide in 2012, Job Coach positions in 2014-2016; and as a bus guide in 2016.

White believes she was better qualified to be a Dorm Teacher Aide than Lizik, who was selected for a position posted January 29, 2012. White had filed an EEOC complaint alleging discrimination in 2011. White was pregnant from October 2011 to July 16, 2012. (White Depo., 70:1-22). The Dorm Teacher Aide position was posted January 2012. (*Id.*).

White believes she was not selected in retaliation for filing an EEOC complaint in 2011.[16] Between 2008 and 2012 four Caucasians were selected as Dorm Teacher Aides. The basis for White's contention of discrimination is that they were white. She also alleges retaliation. (White Depo., 71:20-23). White had no conversation with the Helen Keller School principal asking why other applicants were selected. Dorm Aides were paid less than Dorm Teacher Aides.

Regarding the position posted February 2, 2012, White does not know who applied or who was selected. White acknowledged that if she had been selected, it

---

[16] The Court notes that White's exhibit indicates that there have been three EEOC charges. The first was filed on April 9, 2012. (White Ex. 11). The second was filed on January 28, 2013. (*Id.*). The last was filed on April 21, 2014. (*Id.*).

was a job she would have started immediately.[17] She never asked her principal or talked with her principal about who was selected or why. (White Depo., 94:10-19).

Katie Trotter was selected for the Job Coach position posted on June 3, 2014. (White Depo., 112:18-20). White does not know Trotter's qualifications. (White Depo., 114:9 to 115:1). Trotter was attending school. (*Id.*). White avers that she was not selected based on retaliation. (White Depo., 112:13 to 115:19). She avers that she had been employed by AIDB for several years prior to Katie Trotter's hiring and she had more seniority and experience and qualifications than Katie Trotter. (White Depo., 114:15-19). White had applied for multiple positions at AIDB and had not been selected, while Katie Trotter had been moved, transferred, and promoted two or three times. (*Id.* at 119:19-22).

Nephateria Jones was employed for the Job Coach position posted June 22, 2015. White alleges that Jones did not possess the necessary qualification, but as the

---

[17] White's deposition states as follows:

Q    The job that was posted February 2, 2012, when was that to begin?

A    It don't tell us what date you will begin. . . .

Q    Was it something if you had been selected, you would have begun immediately?

A    Correct.

(White Depo., 89:2-19).

Court noted above, she was not required to possess those qualifications at the time of hiring. White also believes that Jones was overqualified. (White Depo., 122:17 to 123:1). White thought she was getting a Master's degree from Jacksonville State University. (*Id.*).

White asked to be transferred to the Dorm Teacher Aide position even though the pay was lower than the pay for Dorm Aide because of the different hours. (White Depo., 126:10-14). She wanted the change because of her pregnancy and circadian rhythm disorder. (*Id.*).

White applied for the AIDB Job Coach position posted August 6, 2015. (White Depo., 131:5 to 140:4). For that position, Shametra Miller, an African-American female, was selected. (*Id.* at 136:5-12). White believes Miller was overqualified because she had been a teacher in the Anniston school system. (*Id.* at 137:16-20). White believes she was not selected in retaliation. (*Id.* at 138:13-20).

White applied for the AIDB Bus Guide position posted May 20, 2016. For this position, Michelle Lizik was hired. (White Depo., 147:14-22). Lizik was already serving as a bus guide for route to Montgomery. (*Id.* at 151:1-6).[18] However, she

_____

[18] White's Depo. stated:

MR. SWEENEY:    [Lizik] would [have] had more experience as a bus guide than you for that position because she was already a bus guide?

believes she was discriminated against because she was not hired. (*Id.* at 149:14 to 150:2).

The Job Coach position posted August 23, 2016 was not filled. White believed it was not filled in order to retaliate against her.

White never filed a complaint concerning the use of staff to drive students to the horse barn. She never asked to go. White believed she was discriminated against when she was not allowed to attend a student's[19] graduation. She believes she was discriminated against when she was asked not to have a baby shower during academic times – 1 p.m. to 3 p.m. – but could have a baby shower after 3 p.m. (White Depo., 219:22 to 220:6). There is evidence that others had baby showers on campus during the earlier time. (White Ex.13, 14).

White believes it was discriminatory to be asked to write a statement about administering the wrong medication, when others did not have to submit an additional report. (White Ex. 19, 20). Taken in the light most favorable to White, submitting an additional report was not required under protocol. (White Ex. 22 at 56).[20] To write up

---

A.                    Yes.

(White Depo., 153:6-10).

[19] The student's name is immaterial, so the Court declines to include it in this opinion.

[20] Parties should have included pincites. They did not. As a result, the Court sifted through voluminous evidence to try to fill in the gaps.

the statement took White five minutes, she did it while at work, she was paid for that time, and she was not disciplined. (White Depo., 232:2-4, 242:9-13).

White was removed from the substitute list on October 11, 2012, because of her primary position as a Dorm Teacher Aide. (White Ex. 27). However, she never requested to substitute at the Helen Keller cafeteria on the weekend. (White Depo., 229:17-19). At most, she sent Atkinson an email asking why she was not able to substitute because she believed she could still work on the weekends. (*Id.* at 229:14 to 230:3). In her deposition, White stated that "[r]ight now I am not being discriminated against." (*Id.* at 181:9-12). The Defendants deny generally the allegations of discrimination.[21]

### c.    Response by John Mascia to Allegations of Discrimination

Mascia ("Mascia") serves as President of AIDB. White sues Mascia in his

---

[21] The Defendants state with evidence, and White fails to deny with evidence, that:

41. AIDB is an Equal Opportunity Employer with policies and procedures adopted to assure that all employment decisions are made fairly, for legitimate nondiscriminatory reasons. (Ex. 2, p. 2, Appendix A; Ex. 3, p. 2).

42. AIDB has adopted policies, trained its employees, and post notices of its policies and practices regarding its nondiscrimination policies and practices. (Ex. 2, p. 2, Appendix A).

43. AIDB has adopted and implemented employment practices and procedures designed to be fair and transparent. All employment decisions are based on legitimate nondiscriminatory reasons. (Ex. 3, pp. 2-3).

(Doc. 35 at 10).

official capacity as President of AIDB and in his individual capacity. Mascia has had no involvement or interaction with White in either his official capacity as President or in his individual capacity. (Mascia Aff., 1-2).[22] Mascia requested that he be dismissed from the lawsuit in his individual capacity since there were no facts to support Plaintiff's contentions against him in his individual capacity. (*Id.* at 5). Mascia has not discriminated against White regarding any of the positions to which she applied and was not selected. Mascia does receive information about the person deemed best qualified for a particular position. Mascia does not receive the names or other information about persons who applied for a position but were not selected. He reviews the information submitted about the person recommended to be employed, but he is not provided information about the persons who applied. Mascia had no knowledge that White applied for any of the positions about which she claims discrimination and/or retaliation. Mascia recommended persons to be employed by the AIDB Board based entirely on the credentials of the person being recommended, and without any information about White or anyone else who applied for and was not selected for a position of employment. Mascia never considered anything about White – her gender, her race, or her EEOC complaints – when he made recommendations

---

[22] White admits that she has no factual basis to support a charge of discrimination against Mascia as President of AIDB or in his individual capacity.(Id. at 3-5) (citing White Depo. 227:6-11).

for employment to the Board.[23]

### d. White's Allegations of Specific Job Positions

#### 1. Job Coach Position Posted June 13, 2014

White applied for this position and was interviewed. (Doc. 36-3 at 10). The parties dispute why she was not hired. White avers that she had been employed by AIDB for several years prior to Katie Trotter's hiring and White had more seniority and experience and qualifications than Katie Trotter. (White Depo. at 114:15-19). White had applied for multiple positions at AIDB and had not been selected.(*Id.* at 119:19-22). Katie Trotter had been moved, transferred, and promoted two or three times. (*Id*).

A job coach is assigned to a student to escort them to whatever employment they were training for, evaluate the student and determine what they could do and could not do, assist them in completing job applications and determining job duties,

_____

[23] White perfunctorily denies these allegations, but provides <u>no</u> evidence and <u>no</u> citations to the record disputing them. Under this Court's Uniform Initial Order, this is not a proper way to dispute facts at summary judgment. This Court's Uniform Initial Order is clear:

> Any statements of fact that are disputed by the non-moving party **must** be followed by a specific reference to those **portions of the evidentiary record** upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 3 at 17) (emphasis added).

and assist them and check on them periodically. (*Id.* at 133:17-134:12). White's job experience was limited in scope as she had served in the same position since 2004. (Challender Aff. at 9); (Oldenburg Aff. at 4). [24] White did not have the education, experience or skill set for this position. (*Id.*).[25]

White believes that "Katie came a couple of years after [she] had started at AIDB." (White Depo. at 114:15-19). She further believes that she "probably had more years and experience, tenure than her and probably had my qualifications and everything before Katie". (*Id.*). However, Trotter was completing her education degree. (Challender Aff. at 9-10). She had worked in the transition program at Helen Keller for three years, designing education modules to help students learn employment skills. (*Id.*).

## 2.    Job Coach Position Posted June 22, 2015

White applied for this position, but she was not selected. (Challender Aff. at 10). Nephateria Jones, an African-American female, was selected. (*Id.* at 10-11). The position required "sign language proficiency" within "thirty (30) months of employment." (White Ex. 28). It further required a CDL "within the first twelve (12)

---

[24] Challender's Aff. suggests that the correct date is 2004, not 2014, as Defendants' brief suggests. (Challender Aff. at 9); (Doc. 35 at 12 ¶56).

[25] Without citation, White states that "[she] had limited job experience because [she] was summarily precluded from promotions or other employment opportunities by Defendant." (Doc. 40 at 14).

months of employment", and to "maintain yearly certification for the Alabama School Bus Driver License." (*Id.*). White believes that Jones "didn't get any of her qualifications for sign language and CPR's, CDL's." (White Depo., 123:11-13). White also believes that Jones was overqualified. (White Depo., 122:20-21). Jones had a Master's degree in business. (Challender Aff. at 10). She had worked at a community college transition program helping place students in the community. (*Id.*). White believes Jones's hiring was "[r]etaliation for the EEOC." (White Depo., 126:14). Jones was fired after approximately one year at AIDB. (*Id.* at 125:1-10).

### 3. Job Coach Position Posted August 6, 2015

White applied for this position, but did not receive anything acknowledging her application nor any correspondence indicating she had not been selected for the position. (White Depo. at 135:18-140:7). Shametra Miller, an African-American female, was selected. (Challender Aff. at 11). Miller has a B.A. from Talladega College and a M.Ed. in school counseling. (*Id.*). She was attending school for an Education Specialist degree. (*Id.*). She had worked at Talladega College as a Skill Enhancement faculty member. (*Id.*). She had taught 8th grade physical science. (*Id.*). Given what a Job Coach was expected to do in the community, working with private employers, and writing written reports, Defendants contend Miller was better qualified. (*Id.*). White believes that Miller was overqualified and that Miller was

chosen for retaliatory reasons. (White Depo. at 137:9-138:20). Miller did not remain in the position a year. (*Id.*).

### 4. Bus Guide Postings May 20, 2016

A bus guide assists students on the school bus. It is a part-time position. White applied for it. She had a CDL (Commercial Driver's License) and was qualified for the position. She was interviewed but not selected. White's Ex. 31 indicates that AIDB removed staff from their CDL roster if they had not driven a bus for two years, or indicated that they felt uncomfortable driving a bus. (Doc. 40-31). It also indicates that White both had not driven a bus for two years, and moreover felt uncomfortable driving one. (*Id.*). Lizik was selected for the position. (Challender Aff. at 12). Lizik was already a bus guide. (*Id.*). She was experienced and well qualified. (*Id.*). Lizik was the bus guide for the Talladega to Montgomery route. (*Id.*). She applied for this position to have a shorter route closer to home. (*Id.*). In her deposition, White stated the following:

> MR. SWEENEY:  [Lizik] would [have] had more experience as a bus guide than you for that position because she was already a bus guide?
>
> A.  Yes.

(White Depo., 153:6-10). White claims discrimination regarding this position because she was not selected.

<u>5.</u>      <u>Job Coach Position Posted August 23, 2016</u>

White applied for the position, but it was never filled. (White Depo. at 159:1-3). The position was advertised on August 23, 2016, just before the new principal, Sandra Ware, assumed her position on September 1, 2016. (Challender Aff. at 12-13). Ware is an African-American female. (*Id.* at 13). When she assumed her position as the new principal, she decided that another Job Coach was not the best use of Helen Keller's resources. (*Id.*). She determined that the funds for this position could be better used for other administrative positions. (Ware Aff. at 2). At least as of August 23, 2017, an additional Job Coach has not been added. (*Id.*). White believes the Defendants' were retaliating against her. (White Depo., 157:2-9).

**e.      Allegations of Hostile Work Environment**

<u>1.</u>      <u>Asking White To Write a Statement of Fact Regarding Improper Medicine Given to a Student on August 13, 2013</u>

On August 12, 2013, White administered incorrect medication to a student. The student was taken to the hospital emergency room. (Challender Aff. at 6). Given the serious nature of the matter, Freida Meachem, Vice President of AIDB, requested that White write a statement about what happened. (*Id.*). She was never reprimanded. (*Id.* at 7). It took her five minutes to write. (White Depo., 232:2-4). The concern was that the student might not make it. (Atkinson Depo., 97:12-18). There is evidence that

27

Atkinson did not know what the proper protocol regarding statements was, and that other employees had not written these additional statements. (Atkinson Depo., 53:14-21 , 54 18-23); (White Ex. 19, 20).

### 2. White's Claims Regarding the Horse Barn

White was denied the option to go to the horse barn on Tuesdays and Thursdays. (White Depo., 163:15-22). Instead, she was assigned to stay behind at the campus with a student. (*Id.* at 165:6-9). She believes this was retaliation. (*Id.* at 171:7-10). The other employees who went to the horse barn were white females. (*Id.* at 172:4-13). White did not complain to her supervisors about having to stay back from the horse barn. (*Id*. at 170:25 to 171:10). However, she mentioned the horse barn issues in an EEOC complaint dated January 28, 2013. (White Ex. 32).

White did not point to evidence directly controverting the Defendants' reason for excluding her from the horse barn – she notified her superiors that she had allergies. (Oldenburg Aff. at 6, Appendix A). This fact is deemed admitted.

### 3. White's Claims She Was Prevented from Attending a Student's Graduation

Taken in the light most favorable to White, Jennifer Oldenburg told her to stay in the dormitory and clean during a student's graduation. (White Depo. at 187:9-

13).[26] She had cleaned the dorm the night before, and instead left work immediately. (*Id.* at 189:4-15). She believes this was discriminatory because two white females got to attend, and she was told to clean. (*Id.* at 189:20-22). She complained about this incident. (*Id.* at 190:5-9).

        4.      <u>Request Not To Have Baby Shower During Academic Hours</u>

White asked to have a baby shower between 1p.m. and 3 p.m. (White Depo., 196:7-198:5). This time period was during academic time for Awakenings students. (*Id.*). White was not prevented from having the baby shower, just not at those hours. (*Id.*). However, others had sent out invitations for baby showers during that time. (White Ex. 12, 13, 14).

        **f.**      **Allegations of Disparate Compensation Pay; Overtime; Substitute Work**

        1.      <u>Disparate Compensation and Overtime Pay</u>

White was a Dorm Teacher Aide, and Candy Newman was a Dorm Aide. (White Depo. 234:3-10). She believes that both she and Newman were paid correctly under the salary schedule for their respective positions. (*Id.* at 234:20 to 235:3). When White moved her shift from the second shift to first shift position (also moving

---

[26] Defendants dispute this version of events by arguing that White actually asked not to go. (Doc. 35 at 17 ¶15); (Oldenburg Aff. at 8-9). However, the Court has viewed this and any other properly disputed fact in the light most favorable to White, the non-movant.

from the Dorm Aide position to the Dorm Teacher Aide position), her pay dropped. (*Id.* at 236:23 to 237:4). However, when Newman changed to the first shift her pay remained the same and she had more overtime. (*Id.* at 235:11, 236:23 to 237:1-5)). White knew, when she made the switch, that the first shift had less pay and less opportunity for overtime. (*Id.* at 237:5-17). She never complained that she had less opportunity for overtime. (*Id.* at 237:12-20). She also stated in her deposition that she was paid when she worked overtime. (*Id.* at 236:3-11). The duties in the Dorm Aide and Dorm Teacher Aide positions are very similar, but the Dorm Teacher Aide position has more of an academic setting. (*Id.* at 34:23 to 36:7).

2.    <u>Substitute Work at Helen Keller Cafeteria</u>

In an email dated October 2, 2009, former Principal Dr. Erminel Trescott requested the addition of White to the Helen Keller School and Awakenings substitute list for Dorm Teacher Aide positions. (White Ex. 25, 26). White was removed from the substitute list in October 2012. (White Ex. 27).[27] White did not have any communication with anyone in the cafeteria to make them aware of her

---

[27] White's exhibit indicates the following under the reason for removing her for the substitute position:

> IF NO, REASON:    Remove from substitute position
>                           Primary position– Dorm Teacher Aide

(White Ex. 27).

desire to substitute. (White Depo., 231:5-10). She wanted to work in the cafeteria on the weekends (when she would have been able to), but she never submitted a request to work on the weekends. (*Id.* at 229:13 to 230:3).

## IV. ANALYSIS

### A. Mascia's Motion for Sanctions is Due To Be Denied.

In his brief, "Mascia asks the Court to impose sanctions against Plaintiff and/or her attorney for failing to dismiss him from the lawsuit." (Doc. 35 at 11). This argument is not sufficiently developed[28] and the Court is not tempted to grant such relief. Asking the Court to impose sanctions is something more serious than casually putting in a request in the statement of facts. Additionally, this request for sanctions runs directly afoul of the enumerated process in the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion."). The request for sanctions is **DENIED**.

### B. Atkinson's Motion For Summary Judgment Is Due To Be Granted.

#### a. Atkinson Is Entitled to Qualified Immunity Because White Entirely Failed To Respond to Atkinson's Arguments.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their

---

[28] Such an argument should at least be supported by legal authority.

conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id.*

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the individual defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law. *Anderson v.Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public official would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639,107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken[.]") (emphasis added) (citation omitted);

*Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991).Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonable competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

Atkinson asserts that the doctrine of qualified immunity eliminates all of White's claims against her. (Doc. 38 at 26-28). Atkinson asserts that she was acting "under color of state law" and performing a discretionary function.[29] (*See id.* at 27).

---

[29] White alleged this in her complaint. (See Doc. 1 at ¶ 25, 26, 37). Further, in her declaration, Atkinson stated "[a]t all relevant times, I acted within my discretionary authority in performing my official duties though procedures I was authorized to employ." (Doc. 39-3 at 1). Finally, White states in her deposition:

> Q.  The same is true of Atkinson in her individual capacity, she hasn't done anything that affected your job, did she?
>
> A.  Correct.
>
> Q.  Her actions that you are complaining about in this lawsuit are as an employee of AIDB?
>
> A.  Correct.

(White Depo., 245:15-22).

This means that the burden shifts to White to show that Atkinson is not entitled to qualified immunity.

However, White failed to respond to Atkinson's qualified immunity argument. (*See* Doc. 41 at 12-24); (*See also* Doc. 46 at 3-4). Atkinson argues that this means that she is entitled to qualified immunity under the Eleventh Circuit precedent from *Maldonado*. (*See* Doc. 46 at 3-4). There, the Court stated, in relevant part:

> Maldonado did not respond to the qualified-immunity defense at all, much less provide the judge with any "controlling and materially similar case" demonstrating the use of pepper spray to obtain compliance with a lawful order was unconstitutional. Consequently, the judge concluded the individual defendants were entitled to summary judgment regarding the May 26, 2011, incident based on qualified immunity. The judge further noted qualified immunity would bar all of Maldonado's § 1983 claims, because of his failure to respond to that defense.
> . . .
> The judge did not err in placing the burden on Maldonado to overcome the qualified-immunity defense. Maldonado never disputed the defendants were acting under their discretionary authority; therefore, the burden was on him to demonstrate the defendants violated his clearly established rights. *See Terrell*, 668 F.3d at 1250.

*Maldonado v. Unnamed Defendant*, 648 F. App'x 939, 951-55 (11th Cir. 2016).

In this case, Atkinson filed her Motion for Summary Judgment alleging that qualified immunity protected her from all of White's claims. (Doc. 38 at 26-28). White's response did not mention qualified immunity, much less carry her burden. (*See* Doc. 41 at 12-24). Atkinson's reply points out that White totally ignored the

qualified immunity arguments. (*See* Doc. 46 at 3-5) ("White did not respond at all to the Defendant's qualified immunity defense."). Even in the face of Atkinson pointing this out, White did not respond. The Court finds that Atkinson is entitled to qualified immunity and **GRANTS** Atkinson's Motion.

       **b.**    **The Official Capacity Claims Against Atkinson Are Dismissed**

Atkinson argues that "[t]he claims against Atkinson in her official capacity are . . . due to be dismissed" under Eleventh Circuit precedent. (Doc. 38 at 32-33). In support, Atkinson cites the Eleventh Circuit's opinion in *Busby v. City of Orlando*. (*Id.*). That opinion states, in relevant part, the following:

> In contrast to individual capacity suits, when an officer is sued under Section 1983 in his or her official capacity, the suit is simply " 'another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham*, 473 U.S. at 165, 105 S.Ct. at 3105 (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents. *See id.* 473 U.S. at 165–66, 105 S.Ct. at 3105. . . Consequently, a plaintiff cannot rely on a respondeat superior theory to hold a municipality liable for individual actions of its officers. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir.1982). "[A] municipality cannot be held liable solely because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis in original). Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant to a custom or policy of the municipality. *Id.* at 694, 98 S.Ct. at 2037; *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1503 (11th Cir.1985), *cert. denied*, 476 U.S. 1115, 106

S.Ct. 1970, 90 L.Ed.2d 654 (1986); *Hearn*, 688 F.2d at 1334.

> Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond). *See Kentucky v. Graham*, 473 U.S. at 166, 105 S.Ct. at 3105; *Brandon v. Holt*, 469 U.S. at 471–72, 105 S.Ct. at 877–78. In [plaintiff's] action against the City of Orlando, the district court recognized that the intended defendant was actually the City. To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury.

*Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (internal footnotes omitted).[30] In *Busby*, the district court granted a directed verdict for the defense. *See id.* at 776.

White never responded to Atkinson's arguments on this point. (*See* Doc. 12-24). Further, the state defendant, the Alabama Institute for the Deaf and Blind, is a part of this case. (*See* Doc. 1). A suit against Defendant Atkinson in her official capacity is really a suit against her employing entity, here the Alabama Institute for the Deaf and Blind.

Persuaded by the *Busby* case, and because White ignored the argument, the Court finds that the most appropriate course of action is to grant Atkinson's request

---

[30] See also this Court's decision in *Prowell v. Ala. Dep't of Human Resources*, No. 2:10-CV-2993-VEH, 2012 WL 3848667, *13-14 (N.D. Ala. Sept. 5, 2012) (Hopkins, J.).

to **DISMISS** any official capacity claims against her.

### c. Conclusion

Having found that Atkinson is entitled to qualified immunity, the Court **GRANTS** summary judgment in her favor on all of White's claims.

### C. AIDB/Mascia Motion [31,32]

### a. Discrimination

#### 1. Legal Principles

"Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated

---

[31] As an initial matter, AIDB/Mascia argue that "[t]he Court should dismiss or disregard any claims that occurred before September 27, 2013." (Doc. 35 at 25). White's Complaint states that "[t]his action arises out of the illegal and discriminatory treatment of Mrs. Nekita White between September 27, 2013, to present." (Doc. 1 at 1); (see also Doc. 35 at 25). AIDB/Macia cite to no on-point, controlling case law in support. The Court declines to disregard the incidents occurring before September 27, 2013. Further, there is some authority indicating that a Court may consider conduct outside the scope of a complaint. *C.f. Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1436 (11th Cir. 1998) ("[A] plaintiff can use evidence of time-barred discriminatory conduct to meet his burden of persuasion in a case involving circumstantial evidence of discrimination.").

[32] The Court notes that Mascia did not raise the defense of qualified immunity in his Motion for Summary Judgment or supporting brief. (See Doc. 34); (Doc. 35). In the AIDB/Macia reply, they "incorporate the applicable grounds, defenses, and legal authorities submitted by co-Defendant Christy Atkinson." (Doc. 44). Conceivably Mascia could be raising a qualified immunity defense. However, he did not mention the doctrine by name, cite any legal authority, cite to support in the record, develop an argument, or state it in his original brief. The Court does not find that this belated incorporation-by-reference has fairly raised a qualified immunity defense, and so it proceeds to evaluate the summary judgment motion based on the developed arguments.

employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.2d 1555, 1562 (11th Cir. 1997) (citing other sources).[33] "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id.* (citing other sources).

Where, as in this case, a plaintiff has no "direct evidence," circumstantial evidence of employment discrimination is evaluated under the *McDonnell Douglas* framework. *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1103–04 (11th Cir.2001). Under it, the plaintiff must first establish a prima facie case of discrimination. "Once the plaintiff has made out a prima facie case of discrimination, the employer must articulate some legitimate, non-discriminatory reason for the [employment action]." *Id.* at 1104. If the employer meets this burden of production, the presumption of discrimination is eliminated and the plaintiff must then establish that each of the defendant's proffered reasons is pretextual. *Id.*

In order to show pretext, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision .... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP*

---

[33] Further, "the *McDonnell Douglas* formulation of the parties' burdens applies to section 1983 racial discrimination claims as well as to Title VII claims." *See Busby*, 931 F.2d at 777. The *McDonnell/Burdine* framework applies in § 1981 cases as well. *See Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1339 (11th Cir. 2017) (citing *Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991).

*Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). In evaluating a summary judgment motion, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997) (internal quotations and citations omitted).

*Jackson v. State of Ala. State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *see also Ezell v. Wynn*, 802 F.3d 1217, 1226-27 (11th Cir. 2015). "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000);[34] *see also King v. Ferguson Enterprises, Inc.*, 971 F. Supp. 2d 1200, 1218 (N.D. Ga. 2013).

## 2.   Analysis

AIDB/Mascia argue that "[White] asks the Court to find discrimination because she was black or if the person who [was selected] was black, because she was a

---

[34] Though the *Chapman* case was about the Americans with Disability Act and the Age Discrimination in Employment Act, this statement of law has been cited favorably in Title VII cases. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265-66 (11th Cir. 2010).

female, or if the person selected was a black female, because she was being retaliated against." (Doc. 35 at 27). Additionally, AIDB/Masica proffer reasons why others were hired for the four job coach positions and the one bus guide position.[35] (*Id.* at 28-29). Of the five positions, AIDB hired two African-American females and two Caucasian females. (*Id.*). AIDB/Mascia never filled one position, arguing the position was ultimately unneeded. (*Id.* at 29).[36]

For the June 13, 2014, job coach position, White was unaware of much of the eventual hire's qualifications. (White Depo., 114-116). White claims she was not hired for retaliatory reasons, not discrimination. (*Id.* at 115).

For the June 22, 2015, job coach position, AIDB/Mascia hired "[Nephateria] Jones, an African-American female, with a Master's degree, and college transition program experience." (Doc. 35 at 28); (*see also* Challender Aff. at 10). In her deposition, White claimed that Jones was both overqualified and under-qualified. (White Depo., 122-23).[37]

---

[35] AIDB/Mascia note that this position was posted twice, but there was ultimately only one position. (Doc. 35 at 29).

[36] White expressed the opinion that this position was not filled for retaliatory reasons, not discriminatory. (Doc. 36-1 at 115-59).

[37] White stated at one point, "I know she was over qualified." (White Depo. at 122). She then also stated, "She didn't get any of her qualifications for sign language and CPR's, CDL's." (*Id.* at 123).

For the August 6, 2015, Job Coach position, AIDB/Mascia hired "Shametra Miller, an African-American female, with a college degree and a Master's degree. . . Miller had worked with Talladega College as a Skill Enhancement faculty member." (Doc. 35 at 28); (*see also* Challender Aff. at 11). White believes that Miller was overqualified. (White Depo., 137).[38]

The August 23, 2016, job coach position was never filled. (Doc. 35 at 28). AIDB/Mascia offer an affidavit from the Principal Ware, an African-American female, to explain that the position was unneeded. (Doc. 35 at 29); (*see also* Ware Aff. at 1-2).

The bus guide position was filled by a Caucasian female who was already working as a bus guide but merely "wanted a shorter route home." (Doc. 35 at 29); (*see also* White Depo., 151).

White argues "that there is no direct evidence [of] discrimination but there is circumstantial evidence of discriminatory intent." (Doc. 40 at 25). She argues that "she meets all the requirements for a prima facie case of race and sex discrimination." (*Id.* at 27). She argues that she is an "African American female" who suffered from "adverse job action[s]" in favor of "similarly situated employees outside her

---

[38] White notes that, after a year, Miller was promoted within the AIDB. (White Depo. at 137).

classification." (*Id.*). In her response, White only makes discrimination arguments regarding the positions eventually given to Lizik and Newman. (*Id.* at 25-28).[39]

In this case, AIDB/Mascia gave plausible explanations for why they choose other candidates over White. White has not adequately rebutted these explanations. She has not set forth "sufficient evidence to find that the employer's asserted justification is false." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). White merely concludes in her response that she is more qualified. (Doc. 40

---

[39] Since, White has only decided to respond to those two job hiring decisions, the Court concludes that White is not contesting any other potential claims of discrimination. In other words, if White had really wanted to argue that there were other claims of discrimination than just two claims, she would have mentioned them. The Court only considers the arguments actually presented:

> The district court did not consider that argument because it was not fairly presented. Only one sentence in Smith's 116-page petition for a writ of habeas mentioned the possibility of inter-claim cumulative analysis and no authority was cited for it. Smith did not even allude to the argument in his combined 123-page memoranda of law in support of his petition. That is not adequate presentation of the issue. *See United States v. Massey*, 443 F.3d 814, 819 (11th Cir.2006) (an issue was not adequately presented unless it was raised in a way that the district court could not misunderstand it); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *cf. Flanigan's Enters. Inc. v. Fulton County*, 242 F.3d 976, 987 n. 16 (11th Cir.2001) (holding that an argument was waived because the appellants "fail[ed] to elaborate or provide any citation of authority in support of" the argument in their brief). Because the issue or argument was not properly presented to the district court, we will not decide it. *See Johnson v. United States*, 340 F.3d 1219, 1228 n. 8 (11th Cir.2003) ("Arguments not raised in the district court are waived."); *Hurley v. Moore*, 233 F.3d 1295, 1297-98 (11th Cir.2000); Nyland v. Moore, 216 F.3d 1264, 1265 (11th Cir.2000); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1511 n. 30 (11th Cir.1996); *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir.1994).

*Smith v. Sec., Dep't of Corrections*, 572 F.3d 1327, 1352 (11th Cir. 2009).

at 27-28). White can certainly believe that she is a better candidate than the ones chosen. *See Jones v. University of North Ala.*, No. 3:15-cv-01712-AKK, 2017 WL 476540, *5 (N.D. Ala. Feb. 6, 2017) (Kallon, J.) ("Jones certainly has every right to believe he was overqualified and the best candidate for the position."). "However, the selections officials believed otherwise and have explained why they ranked other candidates higher than [the plaintiff]." *Id.* It is not this Court's job to second guess these decisions. *See id.* (citing *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1207 (11th Cir. 2013)).

For the aforementioned reasons, the Court **GRANTS** summary judgment in favor of AIDB/Mascia on White's discrimination claims.

### b.    Retaliation

#### 1.    Legal Principles

"Retaliation against an employee who engages in statutorily protected activity is barred under . . . Title VII . . . ." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257-58 (11th Cir. 2012). The Supreme Court originally established the basic allocation of burdens and order of proof in a Title VII disparate treatment case based upon circumstantial (as opposed to direct) evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* model, a plaintiff first has the burden of proving

by a preponderance of evidence a *prima facie* case of retaliation. Within the Eleventh Circuit:

> A plaintiff establishes a *prima facie* case of retaliation by showing that: (1) she "engaged in statutorily protected activity"; (2) she "suffered a materially adverse action"; and (3) "there was a causal connection between the protected activity and the adverse action." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010); *accord Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).

*Gate Gourmet*, 683 F.3d at 1258.[40]

### i.    *First Element – Protected Activity*

Concerning the first element, statutorily protected activity triggering coverage under Title VII's antiretaliation provision comes in two forms – opposition-based or participation-based conduct. More specifically, "[a]n employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (on petition for rehearing) (citing 42 U.S.C. § 2000e-(3)(a)).

---

[40]  *Davis* (which *Gate Gourmet* relies upon) was abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), as stated in *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294 (11th Cir. 2018).

Concerning the opposition clause more specifically:

> [A] plaintiff can establish a *prima facie* case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. <u>A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.</u>
>
> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation o[r] informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a *prima facie* case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis by underlining added) (alteration added to correctly quote from *Sias*) (footnote omitted).

Regarding the broad coverage afforded under Title VII's participation clause, the Eleventh Circuit has explained:

> Congress chose to protect employees who "participate[ ] in any manner" in an EEOC investigation. 42 U.S.C. § 2000e-3(a) (emphasis added). The words "participate in any manner" express Congress' intent to confer "exceptionally broad protection" upon employees covered by Title VII. *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 n.18 (5th Cir. 1969). As we pointed out in *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997), "the adjective 'any' is not ambiguous. . . . [It] has an expansive meaning, that is, one or some indiscriminately of whatever kind. . . . [A]ny means all." (internal quotations and citations omitted). Because participation in an employer's investigation conducted in response to a notice of charge of discrimination is a form of participation, indirect as it is, in an EEOC investigation, such participation is sufficient to bring the employee within the protection of the participation clause.

*Clover*, 176 F.3d at 1353.

### ii.    *Second Element – Materially Adverse Action*

As defined by the United States Supreme Court in *Burlington Northern*, a materially adverse action is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57; *see also Gate Gourmet*, 683 F.3d. at 1259 (same); *id.* at 1260 (finding material adversity in an employer's decision to deny a light-duty position to the plaintiff after she filed and refused to settle an EEOC charge). A materially adverse action can arise within or without the workplace. *See*

*Burlington Northern*, 548 U.S. at 57 ("[T]he antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.").

### *iii. Third Element – Causal Connection*

The third element requires proof of a causal connection between the plaintiff's protected activity and the materially adverse action. As a divided Supreme Court held, Title VII retaliation requires proof of customary but-for causation, rather than the less burdensome motivating-factor standard applicable to Title VII discrimination claims:

> Based on these textual and structural indications, the Court now concludes as follows: Title VII retaliation claims must be proved according to <u>traditional principles of but-for causation</u>, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (emphasis added); *cf. id.* at 343 ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act."); *id.* ("It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

"At a minimum, a plaintiff must generally establish that the employer was

actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citations omitted).

### *iv.*     *Post-Prima Facie Case Considerations*

Once a plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If the defendant carries its burden of production, "[t]o survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination [or retaliation]." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)); *see also Reeves*, 530 U.S. at 148 ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated [or retaliated].").

A plaintiff can prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered

legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771 (internal quotation marks omitted) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)).

2.    Analysis

AIDB/Mascia argue that "[White's] *prima facie* case fails because she can establish no causal connection between her EEOC charges and the decisions made to promote better qualified people." (Doc. 35 at 29). They point to the substantial delay in time between the EEOC complaint and the relevant actions. (*See id.* at 30).

In this case, there are three EEOC complaints. The first was filed on April 9, 2012. (White Ex. 11). The second was filed on January 28, 2013. (*Id.*). The last was filed on April 21, 2014. (*Id.*). The Eleventh Circuit has indicated that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Here, White's retaliation claim falls short because she cannot establish that it was the "but for" causation of the employment actions. She has not shown the Court that temporal proximity works in her favor or that there is other evidence of retaliation. (*See* Doc. 40 at 28-30) (failing to address temporal proximity).

She has not established her prima facie case.[41] Even if she had, the Court previously discussed how the Defendants articulated reasons for hiring others over her, i.e. the other applicants are more qualified. White does little more than assert that the Defendants' reasons are pretext without showing why. (*See* Doc. 40 at 28-30).

Further, White argues that she was retaliated against when she was not given overtime pay and was taken off "the substitute employee list in October 2012." (*See* Doc. 40 at 29-30). However, once again, White has not shown the "but for" element of causation to survive summary judgment on her retaliation claim. October 2012 is more than three months from the then most recent EEOC complaint (filed on April 9, 2012). Further, White has not shown that the articulated reason for AIDB/Mascia not to give her overtime pay was pretext, given that she moved to a shift in which she knew overtime was scarce and was taken off a substitute employee list because her primary shift conflicted with the job (and she never requested to work on the weekends).

Additionally, White cites to the graduation and baby shower disputes as evidence of retaliation. (Doc. 40 at 30). However, to prove an adverse action "a

---

[41] Even if she had, AIDB/Mascia have set forward legitimate reasons for the employment hiring actions taken, as this opinion has previously explained on pages 14-27. Even if White had not filed her EEOC claim, AIDB/Mascia still would have taken the same employment action. White has not provided evidence or developed arguments showing otherwise.

plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting another source). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (citing another source). "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park,* Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).[42] Here, a reasonable jury cannot conclude that being told to wait a few hours to have a baby shower, or to remain in a classroom and perform job related tasks, is such an adverse action such that it is a "serious and material change in the terms, conditions, or privileges of employment."[43]

Next, as White notes in her brief, no one has filled the job position posted on

---

[42] "Materially adverse actions are those that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *See Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 777-78 (11th Cir. 2014) (quoting another source). In *Smith*, the court determined that "glaring, slamming a door in an employee's face, inquiring into retirement plans, commenting that an employee is not a team player, blaming an employee for failed union negotiations, or harboring concerns over an employee's dependability and trustworthiness are not actions that would dissuade a reasonable worker from making or supporting a charge of discrimination." *See id.* at 778.

[43] This language comes from *Davis. See Davis*, 245 F.3d at 1239.

August 23, 2016. (Doc. 40 at 30). However, she has failed to establish but-for causation here. This date is well over three months from her then most recent EEOC complaint (April 21, 2014). In fact, it is over two years later. Even if she did prove causation, she has not overcome Defendants' stated reason for not filling the position – a new principal came in and determined the position was unnecessary. (Ware Aff. at 2). White calls this pretext, but does not explain why it is pretext. (*See* Doc. 40 at 30).

Finally, the Court addresses White's allegations of retaliation through disparate compensation. (*See* Doc. 40 at 29-30).[44] This too does not get past summary judgment.[45] White has not met her prima facie burden. For one thing, it is not clear

---

[44] White only argues disparate compensation in her response to retaliation. (*See* Doc. 40 at 25-28). Disparate compensation was not fairly raised under Count I of the Complaint. (*See* Doc. 1 at 7-9). The Court also notes that disparate compensation was not raised in Count II (retaliation) either, as Count II uses an impermissible form of pleading (simply re-alleging the entire Complaint). (*Id.* at 10-11).

[45] The Court sees no evidence that Mascia was involved in this decision regarding White's pay. She discusses him only in the context of the hiring decisions. (*See generally* Doc. 40). Further, White failed to cite to any record evidence to dispute Mascia's fact that read:

> Plaintiff admits that she has no factual basis to support a charge of discrimination against Mascia as President of AIDB or in his individual capacity.

> (Ex. 2, pp. 3-5).

(Doc. 35 at 10 ¶46). White also said in her deposition:

> Q.    Are you contending that Dr. Mascia as president took action on engaged in conduct in retaliation against you because you had filed EEC [sic] complaints?

who the decision maker regarding the pay issue was. Additionally, it is not clear when her pay was actually docked, and White has made no argument that it was temporally close to an EEOC complaint or that other evidence supports a showing of causation. Even if she had fairly raised disparate compensation and met her prima facie burden, White calls the other employee "her direct counter-part," but does not adequately explain why she is an appropriate comparator.

For the aforementioned reasons, the Court **GRANTS** summary judgment on White's retaliation claims.

### c.    Harassment and Hostile Work Environment

#### 1.    Legal Principles

A plaintiff establishes a hostile work environment claim by showing "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment ... [was] based on a protected characteristic of the employee ...; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under

---

A.    No, sir.

. . .

Q.    Do you have any factual basis to believe that Dr. Mascia knew anything specifically about Nekita White, an employee of AIDB?

A.    No, sir.

(White Depo., 224:12-17 and 226:1-5).

either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir.2002). The fourth element, whether the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that often tests the legitimacy of most harassment claims; and that test is true here. *Gupta v. Fla. Bd. Of Regents*, 212 F.3d 571, 583 (11th Cir.2000).

> To establish that harassing conduct was severe or pervasive, an employee must meet both a subjective and objective test. *See Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir.1999). The employee must establish not only that he subjectively perceived the environment as hostile, but that a reasonable person would perceive the environment to be hostile and abusive. *See Watkins v. Bowden*, 105 F.3d 1344, 1355-56 (11th Cir.1997). . . . Only when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment," is the law violated. *Harris*, 114 S.Ct. at 370 (internal quotations and citations omitted).

*Barrow v. Georgia Pacific Corp.*, 144 F. App'x 54, 56 (11th Cir. 2005). "In evaluating the objective severity of the alleged hostile work environment, we consider '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Corbett v. Beseler*, 635 F. App'x 809, 816 (11th Cir. 2015) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)).

## 2.     Analysis

AIDB/Mascia refer to White's four alleged incidents and say that they are

"insufficiently severe or pervasive to alter the terms and conditions of [White's] employment and create an abusive working environment." (Doc. 35 at 31-32) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)). Those four incidents, according to Defendants, are:

> 1. Defendants asked Plaintiff to write a statement of fact describing what happened when she administered the wrong medicine to a student. The incident had serious implications in that the student was sent to the emergency room. It took Plaintiff five minutes to write the report. Plaintiff was not reprimanded for this incident. (Ex. 3, p. 6; Ex. 1, 232:2).
>
> 2. Defendants asked Plaintiff not to schedule a baby shower during academic class time, but to do so after 3 p.m. when the baby shower would not interfere with academic classes. (Ex. 1, P. 196:21-198:5).
>
> 3. Plaintiff was not asked to drive students to the Equestrian Center for hippo therapy. After Plaintiff told Defendants being around horses aggravated her allergies. Defendants respected her request not to send her to the horse barn. (Ex. 4, pp. 8-9).
>
> 4. Plaintiff complains that the tone of an email from the Principal of Helen Keller School, Christie Atkinson, was hostile. The email responded to Plaintiff's question why did she need to write a report about administering wrong medicine to a student. Atkinson said because she was asked to do by Vice President Freida Meacham. (Ex. 1, 181:26-184:6).

(Doc. 35 at 31).[46] White also stated the following in her deposition:

---

[46] This is what the Defendants argue, but obviously, the Court views all properly disputed facts in the light most favorable to White.

Q.  How do you claim that you have been subjected to a hostile environment at work?

A.  The tone of the emails, being treated unfair and not equal to the rest of the employees, being isolated to stay in the dorm with one child, not being able to go to the graduation, not being promoted or transferred to a different position.

(White Depo., 181: 16-23).

White never responded to the AIDB/Mascia Motion on Count III. (*See generally* Doc. 40). White responded to the discrimination claim in the first section of her argument (*id.* at 25-28) and to the retaliation claim (*id.* at 28-30), but for some reason passed over her harassment and hostile work environment claim. Perhaps White never intended to bring Count III against AIDB/Mascia at all. The Complaint runs dangerously close, if it is not already there, to being a shotgun complaint.[47]

---

[47]  This Court has previously defined a shotgun complaint:

"The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Another confusing aspect of many shotgun complaints is the practice of lumping multiple claims and/or multiple defendants together within the same count or counts. A complaint that contains shotgun characteristics make it " 'virtually impossible to know which allegations of fact are intended to support which claim(s) for relief' ... [and] does not comply with the standards of Rules 8(a) and 10(b)." *LaCroix v. W. Dist. of Kentucky*, 627 Fed.Appx. 816, 818 (11th Cir. 2015), *cert. dismissed sub nom. LaCroix v. U.S. Dist. Court for W. Dist. of Kentucky*, 136 S. Ct. 996, 194 L.Ed. 2d 2 (2016) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

*Zanaty v. Wells Fargo Bank, N.A.*, No. 2:16-CV-0277-VEH, 2016 WL 6610443, *2 (N.D. Ala.

This Court has previously stated:

> "Courts are not obligated to read a party's mind or to construct arguments that it has failed to raise and that are not reasonably presented in the court file." *Jones v. Pilgrim's Pride, Inc.*[,] 741 F.Supp.2d 1272, 1275 (N.D.Ala.,2010) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it ...."); also citing *Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260* (1st Cir.1999) (declaring that a "party who aspires to oppose a ... motion must spell out his arguments squarely and distinctly, or else forever hold his peace," as district court may ignore arguments not adequately developed by nonmovant)).

*Lynn v. Fort McClellan Credit Union*, No. 1:11-CV-2904, 2013 WL 5707372, *7 (N.D. Ala. Oct. 21, 2013) (Hopkins, J.). Certainly it follows that the Court cannot concoct a different pleading than the one White filed.

The Complaint is not clear to which of the defendants Count III applies. (*See* Doc. 1 at 11-13). Paragraph 42 of the Complaint merely re-alleges every previous paragraph, and so it is entirely unhelpful to the Court. (*Id.* at ¶42). Paragraph 43 then describes the actions of Defendant Atkinson regarding hiring Katie Trotter for an open job coach position. (*Id.* at ¶43). There is no paragraph 44 or 45, despite the Complaint having a paragraph 46. (*See id.* at 11-12). Paragraph 46 is fairly conclusory. (*Id.* at ¶46). Paragraph 47 talks about "Defendant's agents" and the plural "Defendants" but is not much more specific than that. (*Id.*). In the request for relief,

---

Nov. 9, 2016) (Hopkins, J.).

White asks for judgment against the, now singular, "Defendant." (*Id.* at 12-13).

Given that the Complaint does not clearly raise Count III against AIDB/Mascia (in fact, it asks for relief against only one defendant) and that White never responded to AIDB/White's Motion for Summary Judgment on Count III,[48] the Court could interpret the Complaint to have never raised a claim against AIDB/Mascia under Count III in the first place.

However, even construing the Complaint to have raised a harassment/hostile work environment claim against AIDB/Mascia, the evidence proffered is insufficient, viewed in the light most favorable to White, to find that a reasonable jury could determine this to be an abusive work environment. Filling out a written statement of facts following a medical emergency, not having a baby shower when others were permitted to, not going to visit the horsebarn, and the tone of an email[49] do not rise to the level of severity required. This is so considering the case as a whole, not just

---

[48] White did respond to Atkinson's Motion on Count III. (*See* Doc. 41 at 21-24).

[49] The Court notes that it was not enough in *Corbett* when the plaintiff showed sporadic comments where she was called "'bossy,' 'bitchy,' 'abrasive,' 'dumb,' and a 'stupid fucking bitch.'" *See Corbett*, 635 F. App'x at 816. Atkinson's email to White regarding the medical emergency stated:

> Because my supervisor, Frieda Meachem said for you to do so. Therefore, I am giving you a directive to write down the details of what occurred. Thank you in advance.

(White Ex. 17). No reasonable jury could find this email an example of extreme conduct.

the four incidents the Defendants discussed. "Title VII is not a general civility code." *Corbett*, 635 F. App'x at 816. At most, the evidence in this case shows an issue of "personal animosity," and falls well short of extreme conduct.

For that reason, the Court **GRANTS** summary judgment in favor of AIDB/Mascia on the harassment/hostile work environment claim.

## V.    CONCLUSION

In conclusion, the Court takes the following actions regarding Defendant Atkinson:

- Defendant Atkinson's Motion To Strike is **DENIED**.

- Defendant Atkinson is entitled to **QUALIFIED IMMUNITY** on all claims against her in her individual capacity.

- All claims against Defendant Atkinson, in her individual or in her official capacity, are **DISMISSED**.

The Court takes the following actions regarding Defendant AIDB/Mascia:

- Defendant AIDB/Mascia's Motion To Strike is **DENIED**.

- Defendant Mascia's request for sanctions is **DENIED**.

- The Court **GRANTS** summary judgment in favor of AIDB and Mascia on all claims.

The Court will enter the appropriate final order.

**DONE** and **ORDERED** this the 28th day of February, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge